**John BROOKE, Petitioner,**

v.

**Terry WILLIS, Respondent.**

**No. 94 CV 7493 (SAS).**

United States District Court,
S.D. New York.

Aug. 2, 1995.

John Brooke, Lilycroft, Bradford, West Yorkshire, England, pro se.

Terry Willis, White Plains, NY, for respondent.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Petitioner John Brooke ("Petitioner") has filed this Complaint and Petition under the Hague Convention on the Civil Aspects of Child Abduction ("the Convention") and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 et seq., against his ex-wife

Terry Willis ("Respondent"). Petitioner seeks to compel Respondent to appear in court with their daughter Demelza to show cause for the alleged wrongful retention of the child in the United States. Pursuant to the goals of the Convention, Petitioner then seeks a court decision ordering the immediate return of Demelza to England. For the reasons set forth below, the petition is granted.

## I. FACTUAL BACKGROUND

Petitioner was born in England and is a British citizen. Respondent was born in China but is a naturalized citizen of the United States. *See* Child Abduction and Custody Act Questionnaire, dated September 9, 1994 ("Questionnaire"), at pp. 1–2. Although the facts regarding family history are somewhat sketchy, the parties were married in Wheaton, Illinois and Willis later gave birth to Demelza on May 22, 1984. *See* Telephone Conference, dated June 16, 1995 ("Tel. Conf."), at p. 7.[1] In 1987, the parties were formally divorced. *See* Questionnaire at p. 4. Although it is not stated in the record, it appears from later court documents that the parties were residing in California at the time of their divorce.

On July 9, 1990, the Superior Court of California, County of Marin, executed a Stipulation and Order Regarding Child Custody and Visitation. The Order provided for joint legal and physical custody of Demelza and stated that the child should spend fifty percent of her time with each parent. *See* Stipulation and Order at ¶¶ 3, 4. In addition, paragraph 4 pronounced that "the parties intend that half of Demelza's education be in the United Kingdom and the remaining amount in the United States of America." Both parties stipulated that this agreement would be effective in all countries, including the United States and the United Kingdom. *Id.* at ¶ 8. At this time, the parties also signed an agreement specifying the time periods Demelza would spend with each parent and in school in England and the United

---

1. On June 16, 1995, the Court conducted an *ex parte* telephone conference with Petitioner. As detailed below, Petitioner's attempts to serve and contact the Respondent were unsuccessful. However, these efforts were sufficient to satisfy due process notice requirements. *See infra* pp. 59–60.

States. Affidavit of John Brooke, dated September 8, 1994 ("Brooke Aff."), at pp. 1–2.

Petitioner decided to move back to England permanently in the summer of 1990. *Id.* at p. 2. Pursuant to the Stipulation and agreed upon timetable, Demelza accompanied Petitioner to England in July, 1990. Demelza lived with Petitioner and his parents in Bradford Yorkshire, England throughout the summer. *See* Declaration of John Edwin Brooke (Petitioner's father), dated December 9, 1990. In accordance with the custody timetable, Petitioner returned Demelza to Respondent in California on August 28, 1990. *See* Brooke Aff. at p. 2.

Respondent failed to return Demelza to England in December, 1990 in violation of the Stipulation and Order and the timetable. *Id.* Petitioner then left England and went to California to contact Respondent and Demelza. At first, Respondent allowed Petitioner to visit with his daughter several times, but she then filed an ex-parte restraining order against him in a California state court. Petitioner claims that before it was time for the parties to appear in court, however, Respondent fled the state with the child. This same series of events later took place in Virginia. *See* Tel.Conf. at pp. 4–5. As a result of Respondent's evasive behavior, state misdemeanor warrants were issued for her arrest in both California and Virginia. *Id.* at p. 5. These warrants remain outstanding and Petitioner has been unable to exercise his custody rights since the summer of 1990.

Petitioner last saw his daughter on October 25, 1993 in Virginia. Brooke Aff. at p. 3. He last spoke to his daughter and Respondent in late March or early April of 1994. Around this time, Respondent provided Petitioner with a White Plains, New York address. Tel.Conf. at p. 6.

## II. THE PRESENT PETITION

Petitioner first became aware of the Hague Convention on the Civil Aspects of Child Abduction on or about August 30, 1994. Brooke Aff. at p. 1. He claims that had he known about this remedy at the time of the initial abduction in December, 1990, he would have made an application under the Convention at that time. *Id.* at p. 3.

On October 5, 1994, Petitioner filed a Complaint and Petition under the Hague Convention and ICARA in the United States District Court for the Southern District of New York seeking: 1) a writ of habeas corpus ordering Respondent to appear in court with Demelza to show cause why the child has been kept from Petitioner; 2) a warrant in lieu of a writ of habeas corpus authorizing any United States peace officer to take Demelza into protective custody without the knowledge of Respondent; 3) an order directing the Federal Marshal or other peace officer to enter Demelza's name into the national police computer system (N.C.I.C.) missing persons section; 4) an order giving any United States peace officer the authority to search any place where Demelza is reasonably believed to be present; 5) an order directing the prompt return of Demelza to Petitioner; and 6) an order for a Hague Convention hearing. Petitioner would also like the court to reserve the right to award Petitioner costs, fees, travel expenses and attorney's fees.

Federal Marshals have attempted to personally serve Respondent at both the White Plains address she gave Petitioner and at a Manhattan address furnished to Petitioner by the U.S. State Department, Office of Children's Issues. *See* Tel.Conf. at pp. 7–8. Petitioner also claims to have verbally informed Respondent of his petition and to have mailed her copies of all relevant papers. *Id.* at pp. 10–11.

## III. DISCUSSION

The Hague Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble. ICARA, which implements the Convention in the United States, provides that state courts and United States district courts have concurrent original jurisdiction of actions arising under the Convention. *See* 42 U.S.C. § 11603(a).

Under Article 19 of the Convention, a federal district court may determine the merits of a wrongful abduction claim but may not

decide on the merits of the underlying custody dispute. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.1993). Initially, the court must determine whether the petitioner may invoke the protection of the Hague Convention for an alleged wrongful abduction of the child. *See Meredith v. Meredith*, 759 F.Supp. 1432, 1434 (D.Ariz.1991).

### A. *Notice*

■ As a threshold matter, due process requirements dictate that proper notice of the proceedings be given in order that the other parent can appear or otherwise inform the court of his or her position. *Meredith*, 759 F.Supp. at 1435. Although the Convention itself does not specify any notice requirements, ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. *See* 42 U.S.C. § 11603(c).

In the United States, the Parental Kidnapping Prevention Act ("PKPA") and the Uniform Child Custody Jurisdiction Act ("UCCJA") govern notice in interstate child custody proceedings. *See Klam v. Klam*, 797 F.Supp. 202, 205 (E.D.N.Y.1992). Section 4 of the UCCJA and Part (e) of the PKPA provide that reasonable notice and opportunity to be heard must be given to all parties before a custody determination is made. Section 5 of the UCCJA further provides that notice "shall be given in a manner reasonably calculated to give actual notice."

■ Here, several attempts were made by Federal Marshals and by Petitioner to personally serve Respondent and to mail her the relevant papers at her last two known New York addresses. These attempts were apparently unsuccessful because of Respondent's evasive tactics. In light of the circumstances, it does not appear that Petitioner could have done any more to notify Respondent. Furthermore, Petitioner claims to have given Respondent particular details regarding the proceedings over the phone, including the case number and the location of the Court. *See* Tel.Conf. at p. 11.

Both state and federal courts have found service to be sufficient and proper under similar circumstances. In an interstate custody case where personal service was impossible due to the flight of the respondent, the court allowed substituted service in any manner "reasonably effective to give the defendant notice of the suit." *See Ingram v. Ingram*, 463 So.2d 932, 936 (La.App.1985). The court further noted that although there was no personal service, the record reflected the respondent's actual knowledge of the pending litigation. *Id.* at 934. And in a federal case dealing with a petition under the Hague Convention, the court found service to be proper where the father sent papers to the mother's parents and specifically informed the mother of the proceedings over the phone. *See Meredith*, 759 F.Supp. at 1433. In light of these precedents, and the history of Respondent's prior conduct, I conclude that here Respondent has received actual notice of Petitioner's application under the Convention.

### B. *Requirements under the Convention*

■ Several requirements must be met by Petitioner in order to invoke relief under the Convention. First, both countries involved must be signatories to the Convention. *See generally* Lon Vinion, *When Custody Conflicts Cross the Border*, 15 Fam.Advoc. 30 (Spring, 1993). Both the United States and England are signatory countries. Second, the child must be under sixteen years of age. *See* Hague Convention, Article 4. Here, Demelza is eleven years of age. Third, Petitioner must show by a preponderance of the evidence that under the Convention, the child was wrongfully removed or retained from the place of *habitual residence*. *See Wanninger v. Wanninger*, 850 F.Supp. 78, 80 (D.Mass. 1994) (emphasis added).

Article 3 of the Convention provides that "the removal or the retention of a child is to be considered wrongful where—

(a) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and

(b) at the time of removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention."

Petitioner alleges that at the time of the wrongful retention of Demelza in the United States, Demelza was a habitual resident of England and Petitioner had rights of custody pursuant to the Stipulation and Order. Brooke Aff. at p. 2. He further alleges that Respondent's actions violate his rights of custody under the law of England. *See* Memorandum in Support of Verified Complaint, dated October 5, 1994 ("Mem."), at p. 1.

### 1. *Habitual Residence*

The term "habitual residence" was purposely left undefined by the Convention so that its meaning could be determined according to the specific facts and circumstances of each case. *See Meredith,* 759 F.Supp. at 1434. Courts should not interpret the term technically or restrictively, but should examine every situation free from presuppositions. *See Rydder v. Rydder,* 49 F.3d 369, 373 (8th Cir.1995). Place of habitual residence is determined more by a state of being than by any specific period of time; technically, habitual residence can be established after only one day as long as there is some evidence that the child has become "settled" into the location in question. *See* Lynda R. Herring, *Taking Away the Pawns: International Parental Abduction & The Hague Convention,* 20 N.C.J. Int'l L. & Comm.Reg. 137, WL * *19–20 (Fall, 1994).

Here, although Demelza spent only one summer in England, the record reflects that she was well accustomed to her surroundings. Petitioner's parents attest to the fact that the child enjoyed living in their home and visiting with her aunt and cousins. *See* Declaration of Alice Brooke, dated December 14, 1990. Furthermore, according to neighbors, Demelza was happy and well taken care of during her stay, and she even stood in the town square with a flag in hand and recited the British Pledge of Allegiance. *See* Petition of Neighbors, dated December 14, 1990. This evidence is sufficient for the Court to conclude that England was Demelza's habitual residence in July of 1990.[2]

### 2. *Custody Rights*

In order to determine whether Petitioner possessed lawful custody rights of Demelza at the time of Respondent's retention of the child in the United States, the Court looks to the law of the child's place of habitual residence. *Friedrich,* 983 F.2d at 1402. Pursuant to the Convention, there are three possible sources of custody rights under the law of the child's habitual residence: judicial or administrative decisions; legally binding agreements between the parties; and operation of the law of the State. *See Herring, supra,* at WL *25. Although the 1989 Stipulation and Order regarding custody of Demelza was made by a California court rather than a British court, the explanatory report accompanying the Convention provides that a judicial decision regarding custody may originate in a country other than the place of habitual residence. *Id.* (*citing* Explanatory Report by Elisa Paeerez–Vera). Furthermore, when custody rights are exercised in the place of habitual residence based on a foreign custody decree, it is not necessary for the state of habitual residence to formally recognize that decree. *Id.*

As discussed above, the existing Stipulation and Order dictates that both parents have joint physical and legal custody of Demelza. This judicial decision also reflects the parties' desire to have Demelza spend half of her time in England and half of her time in the United States. Most importantly, both parties clearly agreed that the Stipulation and Order would be "effective in all countries, including but not limited to the United States of America, the United Kingdom, Hong Kong, Macau and Canada." Stipulation and Order at p. 3. In light of these facts, there is no doubt that Petitioner possessed legal custody rights under the law of England at the time of Demelza's retention in the United States by Respondent.

### 3. *Exercise of Custody Rights*

The Convention presumes that the person who held lawful custody rights at the time of the removal or retention was actually exer-

---

2. Due to the peculiar circumstances of this case, it is arguable that Demelza is also a habitual resident of the United States under the Conven-

tion. However, for purposes of this petition it is only crucial to determine if England can be considered Demelza's habitual residence.

cising, or would have exercised, such custody rights but for the removal or retention; the burden of proof is on the Respondent to prove that the Petitioner was not exercising his or her custody rights at the time. Herring, *supra*, at WL *29. Respondent has never argued in any court that Petitioner did not possess custody rights to Demelza at the time the child was detained in the United States. Therefore, Petitioner has satisfied the elements of a claim for wrongful retention under Article 3 of the Convention.

## III. RELIEF

Pursuant to due process requirements, United States courts dealing with petitions under the Convention to immediately return children to their alleged places of habitual residence have usually required a hearing to allow both parents to present arguments before deciding whether the child should be returned for further custody proceedings on the merits. *See, e.g., In re Prevot*, 855 F.Supp. 915 (W.D.Tenn.1994); *Currier v. Currier*, 845 F.Supp. 916 (D.N.H.1994). In order to initiate such a preliminary hearing, Petitioner has requested a writ of habeas corpus ordering Respondent to produce the child in court and show cause why the child has been removed and retained away from Petitioner. Petitioner has also requested a warrant in lieu of the writ of habeas corpus.

In light of the fact that Respondent has purposely evaded Petitioner for almost five years and has fled the jurisdiction of two state courts in the past when she was ordered to appear, it is doubtful that Respondent will voluntarily comply with an order to bring Demelza into court. For this reason, the Court will issue a writ of habeas corpus and allow Respondent fourteen days to comply with the order; however, if Respondent has not complied after fourteen days, the Court will then issue a warrant in lieu of the writ of habeas corpus, which will allow any United States peace officer to bring Demelza into court without the consent of Respondent.

Respondent will be given seven days to appear in court from the time Demelza is taken into custody, after which time the Court may hold a Hague Convention hearing to decide if the child should be immediately returned to England with Petitioner. The Court notes that if Demelza is in fact delivered to the court pursuant to the warrant, and Respondent does not appear immediately, the Court can grant temporary custody of the child to Petitioner pending the resolution of these proceedings. *See Currier*, 845 F.Supp. at 919.

The Court will also order the child's name to be entered into the national police computer system (N.C.I.C.) missing persons section in order to aid in identifying her whereabouts. The Court will reserve judgement on an award of costs, fees, travel expenses and attorney's fees until such time as the Court decides whether the child should be returned to England with Petitioner.

The Court's Order embodying this relief is annexed hereto as Exhibit A.

## IV. CONCLUSION

Because Petitioner has satisfied both the threshold requirements for a petition under the Hague Convention and the applicable notice provisions, the above relief is awarded pending the final determination of the petition.

SO ORDERED.

### EXHIBIT A

United States District Court Southern District of New York

John Brooke, Petitioner,

v.

Terry Willis, Respondent.

94 CV 7943 (SAS).

### ORDER

SCHEINDLIN, District Judge.

Petitioner's application is hereby granted:

1) The name of the child, Demelza Brooke, shall be entered into the national police computer system (N.C.I.C.) missing persons section.

2) A Writ of Habeas Corpus shall issue ordering Respondent to appear in this Court with Demelza to show cause why the child

has been kept from Petitioner. Respondent shall be given fourteen days to comply with such Writ.

3) If Respondent has not complied with such Writ after fourteen days, a Warrant in lieu of the Writ shall issue allowing any United States peace officer to bring Demelza into this Court without the consent of Respondent. Respondent shall be given seven days to appear in this Court from the time Demelza is taken into custody.

4) If Demelza is delivered to the Court pursuant to such Warrant and Respondent does not appear immediately, the Court may grant temporary custody of the child to Petitioner pending the resolution of these proceedings.

5) If Respondent has not appeared within seven days from the time Demelza is taken into custody, the Court will then hold a Hague Convention hearing to decide if the child should be immediately returned to England with Petitioner.

SO ORDERED.

Dated: New York, New York

August 2, 1995