Tuulikki Maritta HARSACKY, Appellant,

v.

Frank Joseph HARSACKY Jr. and Minor Children of the Parties, Appellees.

No. 96–CA–0068–MR.

Court of Appeals of Kentucky.

Oct. 11, 1996.

Stephen T. McMurtry, Covington, for appellant.

Thomas W. Amann, Kim Brooks, Covington, for appellees.

Before COMBS, GUIDUGLI and KNOPF, JJ.

## OPINION

KNOPF, Judge:

This case involves an interpretation of the international law regarding child custody across national borders. Having fully considered the briefs and oral arguments of counsel, the authorities cited therein, and the record before the trial court, we find no error and are unable to improve upon the well researched and well written opinion by the trial court. Therefore, we adopt Judge Bartlett's opinion as our own:

"This matter is before the Court on the Petitioner's Motion to return the children of the parties to Finland pursuant to the terms of the 'Hague Convention on the Civil Aspects of Child Abduction'. That Convention has been signed by the United States, and Congress has adopted procedures for its implementation by enactment of the 'International Child Abduction Remedies Act'. [42 U.S.C § 11601, et seq.]

"Hearings have been held before the Court at which the parties testified and offered the testimony of others, including that of expert witnesses. The Court also received reports from court-appointed psychologists concerning the current condition and treatment of the children. In addition, numerous exhibits were admitted into the record.

"Based on the evidence presented and a review of applicable legal authorities, and having considered the Briefs submitted by the parties, the Court is of the opinion that the Petitioner's Motion should be overruled and that this Court should retain jurisdiction to determine issues of custody of the children of the parties.

## FACTS

"The Petitioner, Tuulikki Harsacky, a native of Finland, and the Respondent, Frank Harsacky, a native-born citizen of the United States, were married in California in October, 1989. Mr. Harsacky was in the process of separating from the U.S. Navy. Mrs. Harsacky was trained as a nurse in Finland, but had been living and working in the United States for about ten years. Both Harsacky children, Alexandra (DOB: 11/23/90) and Katherine (DOB: 12/27/91) were born in California.

"In April of 1992, the parties moved their family to Crestview Hills, Kentucky. Mr. Harsacky testified that he had hoped to find work in this area. However, he claims that Mrs. Harsacky soon became unhappy and wanted the family to move to Finland. In any event, they did move to Finland in June of 1992 and remained there until April of 1995.

"While in Finland, the Harsackys purchased a home which was placed in Mrs.

Harsacky's name due to Finnish law. It appears that this home was purchased with the proceeds from the sale of Mr. Harsacky's house in California. It is noteworthy that Mr. Harsacky was not employed during the time that they lived in Finland. Apparently, the family lived off of their assets and government social benefits.

"Sometime in late 1994, the parties discussed a return to the United States. They have offered contradictory testimony as to whether this was to be a permanent move, a vacation or a stay of indefinite duration. There was testimony that Mr. Harsacky considered re-enlisting in the Navy. Likewise, they spoke with a friend in South Texas about job opportunities. It is more than coincidental that Mrs. Harsacky had lived in the South Texas area when she first came to this country. Finally, there is no dispute that the parties wrote for, and received, information from a Chamber of Commerce in Victoria, Texas and contacted a realtor for assistance in locating a place to live in South Texas.

"Prior to leaving Finland for the United States, the Harsackys leased their house and sold many items of personal property, including their cars, boat, furniture, appliances and tools. Moreover, when they travelled to this country in the Spring of 1995, they shipped, at considerable expense, items such as winter clothing, Christmas decorations, books, tools, car parts and rugs. In view of the type of property which they sold in Finland and shipped to this country, the Court is persuaded that the parties intended to relocate to the United States on an indefinite basis, if not permanently.

"The Harsackys arrived in Houston, Texas on April 20, 1995. They immediately contacted realtors about leasing a house or condominium. In the short time that they were in Texas, the parties rented several apartments or condominiums in different locales. Not long after their arrival, Mr. Harsacky purchased two automobiles, a Mercedes and a Chevrolet Suburban. In addition, Mr. Harsacky had resumes prepared and went on job interviews. Indeed, he claims to have been offered a position with a company in Laredo. Clearly, the parties' conduct in Texas is not consistent with a vacation.

"Although Mrs. Harsacky denies any intention to live permanently in the United States, she did acknowledge that they may have stayed here for as long as a year if her husband was able to find employment. This statement contradicts her allegation that they were on a vacation in this country.

"The Court finds that the parties intended to live in this country on an indefinite basis and that they brought their children here for that purpose. This finding is consistent with their conduct and with the fact that Mr. Harsacky was seeking employment which he was unable to find in Finland.

"On May 23, 1995, the Harsackys were living on South Padre Island, Texas. On that date, a violent domestic dispute erupted which resulted in Mrs. Harsacky's arrest. The next morning, Mr. Harsacky took the children and left for Northern Kentucky where his sister resides. They arrived in Kenton County on May 27, 1995. On May 30, Mr. Harsacky filed a domestic violence petition in the Kenton District Court and was given immediate custody of his daughters. On the same day, Mrs. Harsacky filed a Petition for Custody in Cameron County, Texas District Court. In that Petition, she alleged residency in Texas. On June 13, Mrs. Harsacky obtained an Order from a Finnish Court granting her custody of her children. Obviously, neither party appeared before the Court in Finland.

"On July 13, Mrs. Harsacky filed a Verified Petition in this Court seeking custody. By Order dated July 14, 1995, this Court found that it had jurisdiction and awarded temporary custody to Mr. Harsacky. On August 24, Mrs. Harsacky filed her Motion to have this Court return the children to Finland to allow the Courts of that country to determine custody.

### CONCLUSIONS OF LAW

■ "The Petitioner has failed to carry her burden of proof that the children have been wrongfully abducted or retained in violation of the Hague Convention or the International Abduction Remedies Act.

"The purpose of the Hague Convention on the Civil Aspects of International Child Abduction is to deter a parent from abducting or wrongfully retaining a child from its habitual environment and removing the child to a jurisdiction in the hope of obtaining a favorable custody decree. *See*, Explanatory Report by Official Convention Reporter Elisa Perez–Vera, pp. 428–429; *See, also, Friedrich v. Friedrich*, [983 F.2d 1396, 1400 (6th Cir., 1993).] The Convention aims to restore the *status quo ante* and to prevent individuals from establishing legal and jurisdictional links which are more or less artificial. *See*, Explanatory Report by Official Convention Reporter Professor Elisa Perez–Vera, pp. 428–429; *See, also, Rydder v. Rydder*, [49 F.3d 369, 372 (8th Cir., 1995) ].

"Both the Convention and the International Child Abduction Remedies Act, [42 U.S.C. § 11601], require an abduction or wrongful retention. Under Article Three of the Convention, removal or retention is considered wrongful where there is a breach of custody rights under the law of the state in which the child was a habitual resident immediately before the removal or retention. Thus, at the center of many disputes over the applicability of the Convention is a determination of the child's habitual residence prior to removal by a parent. It follows that a child cannot be wrongfully removed or retained if the jurisdiction to which the child is taken can be considered its habitual residence.

"Neither the Convention nor the International Child Abduction Remedies Act defines 'habitual residence'. Indeed, it was intended that this concept remain fluid and fact-based, without becoming rigid. *Brooke v. Willis*, [907 F.Supp. 57, 61 (S.D.N.Y., 1995) ]; *Levesque v. Levesque*, [816 F.Supp. 662, 666 (D.Kan., 1993) ]; *Friedrich, supra*, at [1400–1401]. The definition of habitual residence must be determined by the facts and circumstances presented in each particular case. *Meredith v. Meredith*, [759 F.Supp. 1432, 1434 (D.Ariz., 1991) ].

"In keeping with the principle that 'habitual residence' must be judged on a case by case basis, it is not surprising that courts have disagreed as to what factors should be controlling. For instance, the relatively short length of the child's presence has not prohibited a jurisdiction from being the child's habitual residence. In *Brooke v. Willis, supra*, a child was returned to England even though she had spent less that two months in that country. The Court therein stated:

'Place of habitual residence is determined more by a state of mind than by any specific period of time; technically, habitual residence can be established after only one day as long as there is some evidence that the child has become settled into the location in question.'

[*Id.*, 907 F.Supp. at 61.]

"Similarly, in *Rydder v. Rydder, supra*, children were ordered to be returned to Poland although they had lived in that country for only six months while their father was working there on a temporary assignment. Finally, in the oft-cited case from England, *In re: Bates*, [No. CA 122–89, High Court of Justice, Fam. Div'l Ct. Royal Court of Justice, United Kingdom (1989) ] the habitual residence of the child was found to be New York, rather than London, despite the fact that the child apparently lived in the United States for only a couple of months. *See*, *Feder v. Evans–Feder*, [63 F.3d 217, 222–23 (3d Cir., 1995) ], citing, *In re: Bates*.

"There is also some disagreement as to what extent the intentions of the parents as to present or future residence should bear on the determination of a child's habitual residence under the Convention. In *Friedrich v. Friedrich, supra*, the Court observed that the focus must be on the child, not the parents, and that it must examine past experience, not future intentions. [*Id.* at 1401.] However, in that case the child was returned to Germany where he had lived since birth. The Court rejected the mother's claim that the child should be considered a resident of the United States since she intended to bring him back to this country after her discharge from the military. The Court placed little significance on her intentions for the *future* residence of the child, compared with the fact that he had resided in Germany since birth.

"Other recent decisions have given more weight to the *present* intent of the parents, especially with regard to very young children. In *Levesque v. Levesque, supra,* the Court, again citing *In Re: Bates,* noted that when the Respondent returned to Germany with her child it was her intent to remain indefinitely. The Petitioner had agreed that she could take their child to Germany but argued that he believed she would return to this country with her. The Court ruled that the mutual agreement that the wife could take their daughter to Germany for an unspecified period of time constituted a "settled purpose" sufficient to cause Germany to be the child's habitual residence. [*Levesque,* 816 F.Supp. at 666–667.]

"The term 'settled purpose' had been used in the *Bates* decision to describe the state of mind of the parents which would support a finding of habitual residence. In *Bates,* the Court defined this concept as follows:

'. . . and there must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the propositus intends to stay where he is indefinitely. Indeed his purpose while settled may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does have a sufficient degree of continuity to be properly described as settled'. *See, Levesque v. Levesque, supra,* at 666, citing *In Re: Bates,* at 10.

Again, in *Brooke v. Willis, supra,* the Court commented that a child's habitual residence can be established after as little as one day if the child has become 'settled' into the location. [*Id.* at 60.]

"In *Feder v. Evans–Feder, supra,* the Court noted the agreement of the parents to move to Australia, even though the wife did not intend to remain if the marriage failed. The Court found a settled purpose to live in Australia where the husband had moved to find work. [*Id.,* 63 F.3d at 218.] The Court

further stated that a determination of habitual residence required an analysis of the child's circumstances and the parents' present, shared intentions regarding their child's presence there. [*Id.,* at 224.]

"Other Courts have recognized the importance of considering the parents' present intent concerning the child's residence. *See, Cohen v. Cohen,* [1993 WL 364578 (N.Y.Supp.) ]; *In re: Ponath,* 829 F.Supp. 363 (D.Utah, 1993). In *Ponath* the Court said:

'Although it is the habitual residence of the child that must be determined, the desires and actions of the parents cannot be ignored by the court in making that determination when the child was at the time of removal or retention an infant. The concept of habitual residence must, in the court's opinion, entail some element of voluntariness and purposeful design.' [*Id* at 367.]

Certainly, when considering a parent's complaint that a child has been abducted and wrongfully removed to a jurisdiction, the Court must ask whether the parent intended or agreed that the jurisdiction would be home to the child, if only for an indefinite period.

"In this case, the Court finds that it was the intention of both Harsackys to bring their family to the United States for no less than an indefinite period of time. The facts surrounding their return to this country in April of 1995 show their intent to remain for more than merely a vacation. People who intend only to spend a vacation in any given area do not contact realtors for the purpose of looking at homes to purchase and do not interview for jobs. It is implausible that the Harsackys would sell many of their possessions in Finland and ship the balance of their belongings, at great expense, to this country if they intended to remain for only a few months. The fact that they brought their Christmas decorations and winter clothing, including Mrs. Harsacky's fur coat, to the southernmost part of Texas in April, is inconsistent with Mrs. Harsacky's claim that they were here on vacation. It is more reasonable, and the facts support this Court's belief, that the parties were in southern Texas, an

area previously known to Mrs. Harsacky, for the purpose of relocation. It is undisputed that Mr. Harsacky did in fact look for employment when he arrived in Texas after having been unemployed for nearly three years. In summary, this Court finds that the Harsackys had the settled purpose of bringing their family to the United States in order to locate here on an indefinite basis in the hope that Mr. Harsacky could find employment.

■ "The Petitioner, Mrs. Harsacky, has the burden of establishing by a preponderance of evidence that her children have been wrongfully removed or retained by the Respondent, Mr. Harsacky, in violation of the provisions of the Convention. [42 U.S.C. § 11603(e).] Based on the foregoing, this Court finds and concludes as a matter of law that she has failed to carry that burden of proof. This Court is of the opinion that there was no wrongful abduction or retention of the children from their habitual residence. Both parents agreed to bring their children to this country to make a new home on no less than an indefinite basis. Thus, it cannot be said that Mr. Harsacky abducted or wrongfully retained the children in this country."

■ Mrs. Harsacky now contends on appeal that the trial court should have considered her decision, made prior to May 24, 1995, to return with the children to Finland as a basis to change their habitual residence back to that country. However, this argument was not raised before the trial court. In addition, the trial court's finding that both Harsackys intended to remain in the United States on an indefinite basis contradicts this interpretation. Moreover, we fully agree with the trial court that a determination of habitual residence "must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich v. Friedrich*, 983 F.2d at 1401. Under the circumstances as found by the trial court, Mrs. Harsacky's unrealized future intention cannot change the specific intention demonstrated by the conduct of both parties.

Accordingly, the judgment of the Kenton Circuit Court is affirmed.

All concur.