**Christo NORDEN–POWERS, Petitioner,**

v.

**Inga Karin Loretta BEVERIDGE, a/k/a Inga Norden a/k/a Inga Norden–Powers, Respondent.**

**John Beveridge, Petitioner,**

v.

**Inga Karin Loretta Beveridge, a/k/a Inga Norden a/k/a Inga Norden–Powers, Respondent.**

**Nos. 00–CV–7478 NGG, 00–CV–7480 NGG.**

United States District Court, E.D. New York.

Dec. 22, 2000.

Robert D. Arenstein, New York, NY, for Matter of Aimee Nordenpowers.

### MEMORANDUM AND ORDER

GARAUFIS, District Judge.

John Beveridge and Christo Norden–Powers ("Petitioners") petitioned this court on December 18, 2000 for the return of their respective children under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed.Reg. 10,494 (1986) (the "Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–10 (1988). Petitioner John Beveridge is the father of John Richard Luke Beveridge, born February 11, 1987, and Chloe Beveridge, born Novem-

ber 2, 1988. Petitioner Christo Norden–Powers is the father of Aimee Angelique Norden–Powers, born July 7, 1994. Inga Karen Loretta Beveridge ("Respondent") is the mother of all three children. Petitioners seek an order returning John, Chloe and Aimee (collectively the "Children") to Australia, which is their undisputed country of habitual residence under the Convention, for further custody proceedings.

## I.  FACTUAL BACKGROUND

Petitioners' applications to this court (Exhs.1, 2), including appended declarations, documentation and testimony at a hearing before this court on December 21, 2000 allege the following undisputed facts. The Children resided with Respondent in Australia until September 18, 2000 pursuant to orders of the Australian Family Court. (Exhs.1, 2.) Petitioner John Beveridge enjoyed certain parental visitation rights and was considered a joint guardian under a 1994 Consent Order and Australian Family law. (Exh. 1.) Petitioner Christo Norden–Powers also enjoyed parental rights and visitation rights under a 1999 Family Court Order and Australian Family law. (Exh. 2.) On September 18, 2000 Respondent removed the Children to Long Island, New York, from their residence in Australia without the Petitioners' knowledge or consent. (Exhs.1, 2.) Shortly before their departure Respondent, a citizen of the Republic of Germany, secured German passports for the Children in Sydney, Australia. (Exhs.1, 2.) Upon learning of the Children's disappearance, Petitioners separately petitioned the Australian Family Court *ex parte* for relief.[1] (Exhs.1, 2.)

The Family Court requested the Australian Federal Police to investigate and locate the whereabouts of the Children and return them to Australia. (Exhs.1, 2.) The location of the Children in the Eastern District of New York was ascertained through investigation by Petitioners with the aid of the Australian Federal Police. (Exhs.1, 2.) It was further discovered that Respondent had purchased, in Australia, one-way plane tickets for herself and the Children departing Sydney on September 18, 2000 for New York and continuing on to Frankfurt, Germany on December 23, 2000.[2] (Exhs.1, 2.)

Petitioners also applied to the United States Department of State and the Australian Attorney General's Office, which have been designated pursuant to the Convention as the Central Authority for each of these respective countries. By letter dated December 20, 2000 Jennifer Degeling, the Principal Legal Officer in the Australian Central Authority for the Hague Convention, set forth the Australian law concerning Petitioner's rights in regard to their children pursuant to the procedures under Article 15 of the Convention. (Exh.

---

**1.** The Family Court of Australia suspended the Consent Order of January 25, 1994 between Petitioner John Beveridge and Respondent on September 28, 2000. (Exh. 1.) The Family Court ordered that "pending further order, the Children [John and Chloe will] reside with the Children's father John Douglas Beveridge." (*Id.*) The Family Court further noted "for the benefit of any Overseas Court 'Residence' has replaced 'Custody' in the [Australian] Family Court Act in the description of a non-contact." (*Id.*)

Similarly, the Family Court vacated the prior Order of January 24, 1999 regarding custody of Aimee and directed that she reside with Petitioner Christo Norden–Powers until further order. (Exh. 2.) A second Order issued by the Family Court corresponds to the Hague Convention's Article 15 clarification provision and states, "[t]he Court declared that the removal of the child [Aimee] born 7 July 1994 from Australia to the United States of America on 18 September 2000 was wrongful within the meaning of Article 3 of the Convention on the Civil Aspects of International Child Abduction." (*Id.*) This court may under Article 15 take notice of these decisions and under ICARA award them full faith and credit. *See* Hague Convention, art. 15; *see also* 42 U.S.C. § 11603(g).

**2.** The airline tickets and all the passports of the parties and Children were surrendered to the Clerk of the Court pursuant to this court's Order pending the conclusion of these proceedings.

4.) That letter was supplemented at the request of this court by letter dated December 22, 2000 stating, in pertinent part: "[u]nder the Family Law Act of 1975 [as amended], both parents retain parental responsibility for their children until they reach the age of 18 .... In effect, this means that each parent is jointly responsible for decisions about such things as education and schooling, religious upbringing, medical insurance and treatment." (Exh. 5.)

Petitioners filed this petition December 18, 2000 before this court seeking, *ex parte* "warrants in lieu of writ of habeas corpus" and temporary custody of each child by the respective father pending further proceedings in this court under the Hague Convention for the return of the Children to Australia. This court issued an Order and Warrant in Lieu of a Writ of Habeas Corpus on December 20, 2000 ordering Respondent to appear and show cause why a writ of habeas corpus should not issue and why the Children should not be returned to Australia. A Hague Convention hearing was held on December 21 and 22, 2000.

## II. APPLICABLE LAW

The Hague Convention entered into force on October 25, 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble. Both Australia and the United States are signatories (or "contracting states") to the Hague Convention. *See* Hague Convention, List of Signatories; *see also Brooke v. Willis,* 907 F.Supp. 57, 59 (S.D.N.Y.1995). Under ICARA, state courts and United States district courts have concurrent original jurisdiction of actions arising under the Convention. *See* 42 U.S.C. § 11603(a).

**3.** This court notes that there is a petition pending before the Second Circuit to rehear

■ To prevail in a Hague Convention proceeding a petitioner must prove by a preponderance of the evidence that the child has been "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). In deciding a claim of wrongful removal under the Convention, a federal district court may not reach the merits of the underlying custody dispute. *See Brooke,* 907 F.Supp. at 59–60. The court may only address the merits of a wrongful removal and whether or not the Children should be returned to their place of habitual residence. *See Blondin v. Dubois,* 189 F.3d 240, 245 (2d Cir.1999). Article 3 of the Convention provides that:

> the removal or the retention of a child is to be considered wrongful where:
>
> (a) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

"If a petitioner shows he was wrongfully removed, the court must order the child's return to the country of habitual residence unless the respondent demonstrates that one of the four narrow exceptions apply." *Croll v. Croll,* 229 F.3d 133, 138 (2d Cir. 2000) (citing 42 U.S.C. § 11601(a)(4)).[3] Two of the four narrow exceptions must be established by clear and convincing evidence—"either that 'there is a grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation,' or that return of the child 'would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms.'" *See*

this decision *in banc.*

*Blondin,* 189 F.3d at 245 (quoting Hague Convention, arts. 13(b), 20); *see also* 42 U.S.C. § 11603(e)(2)(A). The two remaining exceptions—either that the proceedings were commenced over a year after the child's removal or that the petitioner was not actually exercising custody rights at the time of the removal—need only be established by a preponderance of the evidence. *See Blondin,* 189 F.3d at 245–46 (discussing the Hague Convention, arts. 12, 13(a)); *see also* 42 U.S.C. § 11603(e)(2)(B). Thus, relief is available to a petitioner under the Hague Convention and ICARA only if the respondent's removal was wrongful and no exceptions apply.

Wrongful removal occurs if a child is removed in violation of "rights of custody" attributed to a person under the law of the State of the child's habitual residence. *See* Hague Convention, art. 3. Petitioners enjoyed specific rights as parents of John, Chloe, and Aimee under Australian law. (Exhs.1, 2.) Thus, this court must determine whether Petitioners' rights under Australian law amount to "rights of custody" as understood under the Hague Convention.

Under the Convention and ICARA, a federal court looks to the law of the child's place of habitual residence to determine whether a petitioner possessed lawful rights of custody at the time of a child's removal. *See* Hague Convention, art. 3; *see also Brooke,* 907 F.Supp. at 61. The Second Circuit has defined the term "custody" as entailing "the primary duty and ability to choose and give sustenance, shelter, clothing, moral and spiritual guidance, medical attention, education, etc., or the (revocable) selection of other people or institutions to give these things." *Croll,* 229 F.3d at 138. The Convention defines "rights of custody" as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5. The Second Circuit concluded that the plural term "rights" refers to a bundle of rights exercised by one or more persons having custody. *See Croll,* 229 F.3d at 139. Thus, under *Croll* a petitioner must possess some number of rights greater than "a single power such as the veto conferred by a *ne exeat* clause" consistent with partial and joint duties and powers in conjunction with the upbringing of a child to enjoy "rights of custody" under the Hague Convention. *Id.*

## III. DISCUSSION

Taking the Second Circuit's decision in *Croll* as the starting point, this court looks to the law of the child's habitual residence in order to determine the Petitioners' "rights of custody" under the Convention. Pursuant to the Convention, there are three possible sources of "rights of custody:" judicial or administrative decisions, legally binding agreements between the parties, and operation of the law of the State. *See* Hague Convention, art. 3; *see also Brooke,* 907 F.Supp. at 61. Petitioners testified at length concerning their powers and duties regarding their children as sanctioned by Australian courts and consented to in legally binding agreements with Respondent. Most of Petitioners' and Respondent's interaction was regulated by court order. In fact, the hearing before this court was replete with testimony regarding the scope and propriety of custody decisions of the Australian courts, clearly demonstrating the wisdom of the Hague Convention that issues regarding custody should be decided by the courts of the country of habitual residence, rather than, as here, a court acting in a country the Children are visiting on extended holiday. *See Croll,* 229 F.3d at 137 ("The Convention rests on the principle that a child's country of habitual residence is best placed to decide upon questions of custody and access.") (internal quotations omitted).

In addition to his testimony before this court, Petitioner John Beveridge submitted with his petition the agreement on consent, approved by the Australian Court between Respondent and himself,

affording him "joint guardianship" with Respondent over John and Chloe. (Exh. 1.) Petitioner John Beveridge testified that pursuant to his rights as demonstrated by this agreement, he participated in educational decisions with Respondent, and that he regularly participated in his children's academic growth. Specifically, he studied with both children and aided in filling out forms for course selection with John and encouraged Chloe to enter advanced course selections. Petitioner John Beveridge discussed his arrangements for John and Chloe to see a dentist regularly being unsatisfied with the dental care they were receiving. Similarly, he recommended and offered to facilitate designating a general practitioner for his children's medical needs, and he recently upgraded John's asthma medication. Petitioner also testified that he taught his children how to surf, and when away spoke over the phone with them every two weeks.

Petitioner Christo Norden–Powers testified to his participation in the care for Aimee. Petitioner discussed his care for Aimee's medical needs, including late night trips to 24 hour clinics. He also referenced court actions in which both he and Respondent, attempting to exercise their parental rights, registered their concerns for the child's well-being. He petitioned the Australian Family Court regarding the condition of Respondent's household, Aimee's readiness to attend kindergarten, and her medical condition. Finally, Petitioner testified to teaching Aimee to rollerblade, ice-skate, and swim. At none of the numerous court appearances attended by Petitioner concerning Aimee's welfare did any court limit Petitioner's parental rights or in any way discourage Petitioner from exercising these rights.

Aside from rights derived from "judicial or administrative decisions or by reason of agreement having legal effect under the law of that State," "rights of custody" arise also by operation of Australian law. Hague Convention, art. 3. The Convention and ICARA expressly permit U.S. federal and state courts to take notice directly of the law or the judicial or administrative decisions of the country of habitual residence country's law, or to request a decision or determination concerning whether or not the removal was wrongful within the meaning of Article 3 of the Convention. *See id.*, arts. 14, 15. The record before this court includes three determinations of Petitioners' parental rights under Australian law: (1) a court order entered by the Australian Family Court on December 15, 2000; (2) a preliminary statement addressed to this court from Australia's Central Authority under the Convention dated December 20, 2000; and (3) a further clarification addressed to this court from Australia's Central Authority dated December 22, 2000. (Exhs.6, 4, 5.) Petitioner Christo Norden–Powers received a decision from the Australian Family Court on December 15, 2000 stating, "The Court declared the removal of the child A[i]mee Angelique Norden–Powers born 7 July 1994 from Australia to the United States of America on 18 September 2000 was wrongful within the meaning of Article 3 of the Convention on the Civil Aspects of International Child Abduction." (Exh. 6.) The Australian Attorney General, acting as the Central Authority under the Convention addressed two letters to the court clarifying Australian law on Petitioners' "rights of custody." In the second letter to the court, the Attorney General stated that under Australian law, the Petitioners each retained with respect to their Children "joint parental responsibility." (Exh. 5.) The letter states that under the Australian Family Law Act § 111B(4) parental responsibility equates to "rights of custody" for the purposes of the Convention. (*Id.*) ("[f]or the purposes of the Convention: (a) each of the parents of a child should, subject to any order of a court for the time being in force, be regarded as having custody of the child") (quoting Australian Family Law Act § 111B(4)). The letter further states that the court orders delineating visiting schedules for Petitioners did not abridge Peti-

tioners' parental responsibilities and listed certain rights which are considered to be "rights of custody" enjoyed by Petitioners including "decisions about such things as education and schooling, religious upbringing, medical insurance and treatment." (*Id.*)

■ From the Australian judicial decisions sanctioning Petitioners' exercise of their rights, the agreement between Respondent and Petitioner John Beveridge, and the operation of Australian law as evidenced by the clarifications of the Family Court and the Australian Attorney General Petitioners derive significant rights. The sizeable bundle of rights vested in Petitioners under Australian law distinguishes this case from *Croll,* in which petitioner possessed nothing more than the limited custodial power arising by operation of a *ne exeat* clause in a custody order granting respondent "sole custody and control." *See Croll,* 229 F.3d at 135; *see also* Hague Convention, art. 5 (" 'rights of custody' shall include rights relating to the care of the person of the child and, *in particular,* the right to determine the child's place of residence") (emphasis added). Thus, Petitioners possess "rights of custody," as understood under the Convention and by the Second Circuit, of such magnitude that this court is constrained to conclude that Respondent's removal of the Children was "wrongful," in violation of those rights.

Nonetheless, relief may not be afforded Petitioners if one of the exceptions outlined in the Convention applies. While separation from any parent and travel back to Australia may be unsettling to these Children, Respondent has failed to prove by clear and convincing evidence that return presents a grave risk of harm. *See* Hague Convention, art. 13(b). The level of risk and danger required to trigger this exception has consistently been held to be very high. *See Blondin,* 189 F.3d at 249 (vacating judgment barring return and remanding for consideration of remedies which would allow for return even when there was convincing evidence of abuse of child); *see also Friedrich v. Friedrich,* 78 F.3d 1060, 1068 (6th Cir.1996) (defining standard of risk as when return places child in imminent danger prior to the resolution of the custody dispute, e.g., returning child to war-zone, place of famine, or site of disease or in cases of serious abuse or neglect, or extraordinary emotional dependence, when courts in the country of habitual residence may be incapable or unwilling to give child adequate protection). Respondent does not suggest an Article 20 exception applies, nor does she allege that the Children have settled into their new environs such that return would be barred under the Convention. *See* Hague Convention, arts. 20, 12.

■ Respondent does allege that Petitioners were not exercising their "rights of custody" at the time of the Respondent's removal of the Children. *See id.,* art. 13(a). Respondent fails to prove this allegation by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B). The most generous reading of the record in favor of Respondent shows that Petitioners have been active, if not dogged, in their exercise of their rights of custody. As discussed at length above, the Petitioners each participated in decision-making regarding the education and social welfare of their children, looked after their medical needs and participated in the care of the person of each child. Finally, each Petitioner contacted their children less then 16 days before their removal. Christo Norden–Powers saw Aimee on September 3, 2000, and John Beveridge had contact with John and Chloe on September 11, 2000. As discussed previously, both Petitioners testified extensively as to their recent exercise of their "rights of custody." Further, the Australian Family Court record of actions preceding the Children's removal is a testimonial to the ongoing efforts of Petitioners, and indeed, Respondent, to exercise control over the care and the persons of the Children. Hence, Respondent's argument is without merit.

Lastly, the court "may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views." The court interviewed John and Chloe *in camera* with reference to their feelings toward returning to Australia. Further, the guardian ad litem representing all three Children submitted a report, (Exh. 7), documenting the concerns of Aimee, as well as John and Chloe. In the interviews and the report the most significant issue was the desire of all three Children to stay together. Each child also expressed a desire to stay with Respondent. While this court is sympathetic to the concerns of each child, their voiced preferences did not rise to the level of an "objection to return" as understood under the Convention. Thus, this court cannot refuse to return under this exception.

## III. CONCLUSION

Because Respondent's removal of the Children violated the Hague Convention and no exceptions apply, this court must order the Children be returned to Australia.

WHEREFORE it is hereby ORDERED:

that Aimee Angelique Norden–Powers shall be returned to Australia forthwith in the custody of Christo Norden–Powers, and that John Richard Luke Beveridge and Chloe Beveridge shall be returned to Australia forthwith in the custody of John Beveridge.

IT IS SO ORDERED.